Lyes, Appellant, vs. Superior Shipbuilding Company
and another, Respondents.

*September 21—October 18, 1921.*

*Negligence: Contributory negligence: Mechanic testing repaired
machinery: Question for jury.*

1. In an action against a shipbuilding company for the death of
   an employee of an electric company who was killed while
   riding in the cabin of a crane in the plant of the shipbuilding
   company while it was being moved to test hoisting mechanism
   on which deceased had made, repairs with the aid of two
   other skilled workers who were engaged with him in making
   the test, *held,* on the evidence as to his experience and knowl-
   edge of the dangerous conditions, that the question of con-
   tributory negligence on the part of deceased in putting his
   head in a dangerous position was for the jury.
2. The contention that deceased was subjected to a hidden danger
   in that the operator of the crane moved the cabin without
   giving notice, is *held* not well founded because the facts and
   circumstances warrant the inference by the jury that de-
   ceased knew the cabin must be moved and that he and the men
   in the cabin were there for that purpose.
   Doerfler, Eschweiler, and Owen, JJ., dissent.

Appeal from a judgment of the circuit court for Douglas
county: W. R. Foley, Circuit Judge. *Affirmed.*

This action was brought by plaintiff for damages alleged
to have been caused by the death of his son at the plant of
the defendant company.   The deceased was killed while
riding in a cabin of a crane which he had been engaged in
repairing and which was being moved to a position over a
propeller wheel to test the lifting or hoisting mechanism
which had been repaired.

Fred Lyes, the deceased, had been engaged in electrical
and mechanical work for five years prior to his death.   At
the time of his death and for two and one-half years prior
thereto he had been employed by the Benson Electric Com-
pany.   On the day in question he had been sent to the plant
of the *Superior Shipbuilding Company* with a workman

named Anderson to assist in the repair of a motor of a movable crane. Anderson asked that the deceased be sent with him because of his ability and knowledge in this work. At the plant of the defendant company they met defendant *Louis Facette*, who had had over twenty years' experience in the operation of the crane. The crane consists of a large steel frame 500 to 600 feet long, extending along a ship dock. Upon this frame there are tracks, and upon the tracks a movable bridge runs the long way of the frame. The bridge has a stationary arm about 200 feet in length extending out on either side of the frame, which is part of and moves with the bridge. The frame extends north and south and the arms of the bridge east and west. Upon this bridge there is a trolley which includes a cabin with motors and drums above the cabin, and the lifting device and hook with which the work is done. The cabin and hook move together with the trolley, the hook being to the west of the cabin. The operator of the cabin faces west and has three controllers in front of him which are connected with motors and work independently of each other, one to move the bridge along the frame either to the north or to the south, the second to move the trolley out upon the cross-arm either to the east or to the west, and the third to raise or lower the hook in doing the work.

The trouble which Anderson and the deceased undertook to fix was with the controller and the motor which raised and lowered the hook. Deceased and Anderson first went over the blue-print of the electrical equipment and mechanism and then examined the motors and electrical equipment of the cabin. The cabin is reached by means of a stationary stairway up the frame and then by another stationary stairway up the bridge or traveling crane. At the top of this stairway and part thereof is a landing platform which is used to enter the cabin when the cabin is in position. The platform and stairway are supported from above by three-inch angle-irons. Anderson testified that the platform came

within about four inches of the door of the cabin, and the diagram introduced in evidence gives the distance as five inches.

In doing their work in the forenoon Anderson and the deceased were all over the cab. They finished their work of repairing the crane in the forenoon, but at the request of the defendant *Facette* returned in the afternoon to test the work of the hook in lifting, to be sure that the trouble had been remedied. They decided to move the crane over and pick up a propeller wheel which was lying upon the ground about one hundred feet south and thirty feet east of where the cabin was stationed. In order to reach the place where the propeller wheel lay and pick it up three movements were necessary: first, to move the bridge south to a point opposite the propeller; second, to move the trolley with the cabin and hook out to a point far enough east of the propeller so that the hook would be directly above it; and then to lower the hook and pick up the propeller. All three movements could be carried on at the same time. The ordinary way for the operation to be made was to start the bridge running south, then start the trolley out upon the cross-arm toward a point opposite the object to be lifted. The stairway and landing platform to the cabin being stationary upon the bridges, the cabin leaves it as it moves out upon the cross-arm.

The three men were in the cabin. Anderson threw on the switches, which had been disconnected, and asked *Facette* to "run it, everything is all right." *Facette* was standing or sitting at the west side of the cabin immediately in front of the controllers, facing the west window where he could lean out and see when he was properly placed. Immediately before starting the deceased had been standing entirely inside of the cabin and by the doorway at the south side thereof. *Facette* started the motor moving the bridge to the south and then started the motor moving the cabin and trolley out upon the cross-arm to the east. When the

cabin had moved the distance of about the width of the platform Anderson saw that the deceased had been struck or his head crushed between the east angle-iron supporting the platform and the door jamb of the cabin.

The jury found that the defendant *Facette,* the operator of the cabin, failed to exercise ordinary care in moving the cabin without giving a signal or warning; that the operator did not fail to exercise ordinary care in the manner in which he started the cabin; and that the deceased was guilty of contributory negligence. The trial court granted the defendants' motion for judgment upon the verdict, from which judgment appeal is taken.

For the appellant there was a brief by *Adams & Jones* of Duluth, Minnesota, attorneys, and *Powell & Sprowls* of Superior, of counsel; and the cause was argued orally by *C. E. Adams.*

For the respondents there was a brief by *Hanitch, Hartley, McPherson & Johnson* of Superior, attorneys, and *Kelley & Cottrell* of Cleveland, Ohio, of counsel; and the cause was argued orally by *C. J. Hartley.*

SIEBECKER, C. J.    The jury's answer to question 5 shows that they found that Lyes, the deceased, was informed of the danger to his safety attending the operation of the crane at the time of the accident, and that he, as an ordinarily careful and prudent man, was guilty of a want of ordinary care in failing to protect himself from being injured by having his head caught between the angle-iron of the landing platform for entering the cabin and the jamb of the cabin door. The evidence tends to show that the deceased was an intelligent and experienced person in working about machinery and that he had several years' experience as a workman in the electrical business. He, with one Anderson, as heretofore stated in detail, worked in and about the cabin of the crane and passed up and down the stationary stairway attached to the frame and bridge and

leading to the door of the cabin in passing in and out of the cabin over the landing platform connected with the stairway, over which persons passed to go in and out of the cabin.   The angle-irons supporting the platform were in plain sight to any one going in and out of the cabin.   The jury was well sustained in concluding that the deceased understood the construction of the bridge, the arms of the crane, and the cabin with its different parts and apparatus. It is manifest from what transpired during the forenoon of the day in question and after Anderson, *Facette,* and deceased had returned to the crane after lunch to test the efficacy of the repairs made during the forenoon, that the deceased was informed that the crane was to be put into operation and that he was engaged with Anderson and *Facette* in making this test.   Under these circumstances the jury was abundantly warranted in finding that the deceased was fully informed that the crane was to be operated to lift the propeller wheel which had been selected for testing the repairs on the crane.   The evidence shows that the deceased participated in making the test; that the propeller was so located as to require the moving of the crane arms on the bridge and the cabin and the trolley and hook which was to be hitched onto the propeller wheel in order to lift it; that the deceased, Anderson, and *Facette* had entered the cabin to operate the crane to make the test; that *Facette* was in place to operate the controllers of the motors which operated the crane on the bridge, the cabin on the crane arm, and the trolley and hook for lifting the trolley wheel; that Anderson called to *Facette:* "Everything is all right— go ahead," and that *Facette* immediately started the motor to move the crane on the bridge and then started the motor that moved the cabin; that the cabin moved a few inches; that deceased's head was caught between the door jamb and the angle-iron, injuring him and causing his death.   There is evidence tending to show that decedent was standing inside the cabin near the door immediately before these

movements of the crane and cabin started. The conditions surrounding him at this time were open and obvious, and he, as an intelligent and experienced man, must be held to. exercise the degree of care for his protection from danger that an ordinarily careful and prudent person would exercise under the same or similar circumstances. Under the foregoing facts and circumstances surrounding this accident the decedent must be held to have had knowledge of all the obvious perils that threatened his safety which were discoverable by reasonable observation and the use of his senses.

It is contended that the decedent was subjected to a hidden danger in that the operator of the crane started the cabin without giving him notice thereof. This claim is not well founded because the facts and circumstances warrant the inference by the jury that decedent was informed of the necessity of moving the cabin or trolley with the hook in order to hitch onto the trolley wheel, and that he and his associates were in the cabin to do this very thing. We think under all of the facts it was a jury question whether or not decedent was guilty of a want of ordinary care in putting his head in the dangerous position which caused his death. We consider this question, under the facts and circumstances of this case, to be within the rule stated in *Klotz v. Power & M. M. Co.* 136 Wis. 107, 116 N. W. 770:

"It is well settled that, where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them." *Richmond & D. R. Co. v. Powers,* 149 U. S. 43, 13 Sup. Ct. 748.

It is considered that the circuit court properly submitted the contributory negligence question to the jury and that the judgment awarded on the verdict must stand.

*By the Court.*—The judgment appealed from is affirmed.

DOERFLER, J. (*dissenting*). The deceased at the time of the accident was twenty-two years of age and had had about three years of experience as an electrical worker. The evidence does not show that the deceased had ever been employed before in repairing or installing electrical apparatus for cranes like the one on which he was injured, nor does it appear that he was familiar with the various movements of the crane and its parts.

On the morning of the day of the accident the deceased and Anderson examined the blue-prints of the crane, showing its electrical operation, and after that they ascended into the cab to examine the electric motor which operated the hoist, which motor was defective and out of order.

The deceased knew when he returned to the shipyard after dinner that he was there for the purpose of testing out the electrical motor that operated the hoist, in order to ascertain the efficacy of the repair work which he and Anderson performed during the morning. The deceased must also be presumed to have known that, in order to lift the propeller wheel, which was between 100 and 200 feet south of the cab and about thirty to forty feet east of the trestle, it would be necessary to utilize all of the motors. There is no testimony, however, to establish knowledge on the part of the deceased that the three movements involved in the test referred to would be performed simultaneously or that it was the usual and customary practice in the operation of the crane to so perform these movements.

There is nothing in the evidence to show that the deceased, in anything that he did, had occasion to examine into the location of the angle-irons on which the platform was suspended or to determine what portions of the crane moved with the cab when the same was operated out on the cross-arms. The impression that an ordinary person would obtain from the knowledge possessed by the deceased, in so far as it is disclosed by the testimony, is that the bridge

would be operated on the main tracks on the trestle until it arrived at a point opposite to where the propeller wheel was located, and that the cab would then be operated upon the cross-arm, and that that operation would be followed by the movement of the hoist. In any event the operation on the main track was first started, and the movement of the bridge thereon was not connected with any danger to the deceased while he was standing in the doorway or even if he extended his head beyond the doorway. Had the bridge continued in its course on the main track to a point opposite to where the propeller wheel was situated, before the motion of the cab on the cross-arm was called into play, there would have been ample justification for a jury finding the deceased guilty of contributory negligence if he had been injured by having his head caught between the door jamb and the angle-iron.

Contributory negligence is a defense, and must be proved by the defendant, unless the plaintiff by his own evidence establishes the fact that he was guilty of such negligence. *Grimm v. Milwaukee E. R. & L. Co.* 138 Wis. 44, 119 N. W. 833.

The answer of the jury to the fifth question of the special verdict is therefore based solely upon speculation and conjecture. On the evidence as it appears in the record the question of contributory negligence should not have been submitted to the jury at all, but, having been submitted, and answered in the manner as shown by the verdict, the answer should have been changed in accordance with the request of plaintiff's counsel.

ESCHWEILER and OWEN, JJ. We concur in the foregoing dissent.